IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| CYNTHIA A. PHILLIPS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:06-CV-088 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claims for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. For the reasons set forth herein, defendant's motion for summary judgment [doc. 15] will be granted, and plaintiff's motion for summary judgment [doc. 13] will be denied. The final decision of the Commissioner will be affirmed.

I.

*Procedural History*

Plaintiff filed the present application in October 2000, with an alleged onset date of March 27, 1995. [Tr. 83]. She claimed to be disabled by "high blood pressure, diabetes, chronic obstructive pulmonary disease, asthma, polycystic ovarion [sic] syndrome, high cholesterol, high triglycerides, rapid heartbeat, [and] essential tremors." [Tr. 90].

Plaintiff specified that her ability to work is limited by "out of control" diabetes, constant weakness, "spells of rapid pulse," and - of particular relevance - breathing problems and a right hand that "shakes all the time without any control over it." [Tr. 90]. The claim was denied initially and on reconsideration. Plaintiff then requested a hearing, which took place before Administrative Law Judge ("ALJ") Peter Behuniak on October 10, 2001.

On March 19, 2002, ALJ Behuniak issued a decision concluding that plaintiff suffers from no "severe" impairment. [Tr. 43-49]. Plaintiff was accordingly found ineligible for benefits.

Plaintiff then sought review from the Commissioner's Appeals Council, which on September 23, 2004, remanded plaintiff's case. [Tr. 306]. The remand order directed:

> 1. that newly-submitted evidence be considered, especially pertaining to complaints of carpal tunnel syndrome;
>
> 2. that plaintiff be found limited to the light level of work - based on the *res judicata* effect of two prior unsuccessful SSI claims - unless medical improvement was found;
>
> 3. that plaintiff's maximum residual functional capacity be further considered;
>
> 4. that additional medical expert evidence should be obtained "if necessary";
>
> 5. that additional vocational expert testimony should be taken "[i]f warranted by the expanded record"; and
>
> 6. that plaintiff should receive a new administrative hearing and written decision.

[Tr. 308-09].

Plaintiff's second administrative hearing was held on May 12, 2005, before ALJ Michael Davenport (hereinafter "the ALJ"). On June 13, 2005, the ALJ issued a decision denying benefits. He concluded that plaintiff suffers from "diabetes mellitus, fatty liver disease with associated early cirrhosis, and chronic obstructive pulmonary disease," which are severe impairments but not equal to any impairment listed by the Commissioner. [Tr. 26]. The ALJ further determined that plaintiff retained the residual functional capacity to perform certain light jobs existing in the regional and national economies. [Tr. 26-28]. Evidence pertaining to carpal tunnel syndrome was reviewed and discussed. The ALJ concluded that plaintiff experiences no more than mild limitations due to that condition. [Tr. 23]. Plaintiff was again ruled ineligible for benefits.

Plaintiff then again sought Appeals Council review, which was denied on March 31, 2006, notwithstanding her submission of more than thirty-five pages of additional medical records. [Tr. 9, 11].[1] The ALJ's ruling therefore became the Commissioner's final decision. Through her timely complaint, plaintiff has properly brought her case before this

---

[1] Plaintiff's additional documents are discussed in her brief and are included in the present administrative record. [Tr. 607-44]. A case can be remanded for further administrative proceedings if a claimant shows that late-submitted evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g). However, despite numerous prior admonitions from this court in other cases, plaintiff's veteran Social Security counsel has made no effort to articulate why sentence six remand is warranted in this case, nor is sentence six even referenced in the briefing to this court. The issue is accordingly waived, and plaintiff's additional evidence [Tr. 607-44] has *not* been considered. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("Plaintiff has not only failed to make a showing of good cause, but also has failed to even cite this relevant section or argue a remand is appropriate."); *Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 663 (7th Cir. 1994) ("Lawyers and litigants who decide that they will play by rules of their own invention will find that the game cannot be won.").

court for review. *See* 42 U.S.C. § 405(g).

II.

*Background and Testimony*

Plaintiff was born in 1966 and has a high school education. [Tr. 83, 96]. She has never worked, other than an apparently brief attempt at babysitting for two hour periods which left her "so weak." [Tr. 91, 111, 700]. She can admittedly shop, visit family, attend church, cook, wash dishes, sweep, care for her cat, and do laundry, although she claims to sometimes need assistance with some of these tasks. [Tr. 151-54, 163-64, 169-70, 692-93]. She is able to "eat out quite a bit" but is purportedly unable to afford health insurance or medication. [Tr. 149, 195, 693].

Plaintiff claims daily leg, foot, and head pain, along with fatigue, chest pain, and "spells" of coughing, smothering, and wheezing. [Tr. 172-73, 178, 183]. For pain relief, she uses over-the-counter medication and a heating pad. [Tr. 177, 181, 189]. At her 2001 hearing, plaintiff testified that her right hand is of limited use because it "shakes all of the time." [Tr. 651]. Plaintiff also alleges constant worry and depression. [Tr. 149, 653]. She has never undergone mental health treatment or counseling. [Tr. 653].

III.

*Relevant Medical Evidence and Opinions*

Health care providers (generally nurse practitioners) have frequently observed "audible wheezing" by plaintiff. [Tr. 201, 205, 207, 214, 217, 219, 223, 226, 228, 280, 401,

4

596-97]. Examinations nonetheless generally show plaintiff's lungs to be "clear." [Tr. 200-02, 205-09, 214-15, 219, 221, 223, 227, 280, 290, 319, 330, 336, 483, 594]. 1997 chest x-rays performed due to plaintiff's wheezing behavior were "unremarkable," showing "normal" heart and "clear" lungs. [Tr. 230-31]. May 2002 chest x-rays and pulmonary function testing produced identical results. [Tr. 366-67]. 1999 speech therapy found no problems with plaintiff's vocal cords. [Tr. 211].

A March 25, 1998 notation from Rural Health Services Consortium ("RHSC") reveals that plaintiff exhibited even, nonlabored respiration that date ***until the provider entered the room***, at which time breathing "seemed to become more forced." [Tr. 225]. Although plaintiff claims to suffer from asthma, provider notations at times question whether there is any physical cause for her wheezing behavior. [Tr. 212, 227].

Plaintiff regularly seeks medical care, generally for diabetes monitoring, cold symptoms, or vaginal issues. The extensive record is however noticeably lacking in musculoskeletal pain complaints or *objective* references to right arm tremors. November 2001 spinal x-rays showed only a minor degenerative change at C6-7. [Tr. 369]. In August 2004, plaintiff reported back pain of one week's duration. [Tr. 313]. X-rays the following month detected some degeneration at L5-S1. [Tr. 348]. Oncologist Janet Drake mentioned a reported tremor in May 2002. [Tr. 448].

Dr. Karl Konrad performed a consultative physical examination in December 2000. Plaintiff alleged "blockage in her lungs" since 1997, lower extremity pain, and "she

5

also sa[id] her right hand shakes." [Tr. 270]. Dr. Konrad "was not convinced [he] received full cooperation from this client." [Tr. 270]. Examination showed full strength and range of motion. [Tr. 271]. Plaintiff "displayed an inconsistent gross tremor of the right hand and forearm ***which was absent when she was distracted.***" [Tr. 271] (emphasis added). Similarly, plaintiff "engage[d] in forced wheezing which is intermittent ***and easily distracted.***" [Tr. 271] (emphasis added). Movement, dexterity, and ambulation were otherwise normal. [Tr. 271]. Mental status otherwise appeared normal. [Tr. 271-72]. Based on his "unremarkable" examination, Dr. Konrad predicted "no impairment-related physical limitations." [Tr. 272].

In early 2004, plaintiff was provided with diabetic shoes and inserts. She was noted to "ambulate[] without difficulty or discomfort." [Tr. 520]. At a followup appointment three weeks later, plaintiff was "doing well" and the shoes needed no adjustment. [Tr. 519].[2]

Plaintiff's diabetes is described in the record as poorly controlled. [Tr. 217, 370, 473]. She is approximately 63 inches tall and weighs as much as 265 pounds. [Tr. 319]. In 1999, pulmonary specialist Robert Taylor gave plaintiff exercise instructions, but she later claimed to be "unaware of what he means." [Tr. 213]. In January 2001, plaintiff admitted that she does not exercise and that she consumes a high fat diet. [Tr. 283]. A typical breakfast at that time consisted of JELL-O, Fruit Loops, or cheese crackers. [Tr. 280]. She

---

[2] At her second administrative hearing, plaintiff claimed extreme foot pain, specifically stating that her diabetic shoes "don't help that much." [Tr. 692].

was contemporaneously counseled to increase her vegetable intake and to reduce her consumption of fats and carbohydrates. [Tr. 280]. In January 2002, plaintiff remained admittedly inactive with excess dietary fat intake. [Tr. 341]. In December 2002, she denied eating "taboo" foods and was purportedly "trying to walk" when weather allowed, but by the following month she was again admittedly inactive with poor diet. [Tr. 329, 340]. In August 2003, she again claimed to be walking "when she can" and following a proper diet. [Tr. 321].[3] In December 2003, plaintiff was counseled regarding the importance of better controlling her blood sugar. [Tr. 376]. Two months later, she was again admittedly inactive with excess dietary fat consumption [Tr. 339] - despite having been counseled two weeks prior by the Center for Digestive Wellness regarding compliance with a low fat, low cholesterol diet. [Tr. 498].[4]

In February 2002, Dr. David Hardin diagnosed bilateral carpal tunnel syndrome, citing positive Tinel's and Phalen's signs. [Tr. 403, 406]. Plaintiff underwent carpal tunnel releases in March 2002 and January 2003. [Tr. 402]. After the surgeries, she reported that she was doing "quite well," with "excellent relief" and no surgical complications. [Tr. 401-02].

---

[3] RHSC notes from that appointment indicate that plaintiff's claims were met with scepticism by the RHSC staff. [Tr. 321].

[4] According to Dr. Jeffrey Fenyves, the purpose of such counseling was "to help control her blood sugar which will in turn help with her fatty liver disease as well as weight loss." [Tr. 481].

7

A February 2002 scan detected a cystic lesion. [Tr. 368]. In August 2002, plaintiff reported that a hysterectomy had cured the problem. [Tr. 413].

A July 2003 liver biopsy indicated early nonalcoholic cirrhosis. [Tr. 515]. At a followup appointment in September 2004, recent labwork was noted to have been negative. [Tr. 567]. Although plaintiff admitted that "she is not exercising at all," she reported that her diabetes was doing better with insulin pump usage. [Tr. 567]. Dr. Fenyves again "emphasized" exercise "which will help her metabolic syndrome." [Tr. 567]. At a December 2004 appointment, cirrhosis was noted to be stable. [Tr. 563]. Licensed Nutritionist/Dietitian Jane O'Connor wrote that "[c]ompliance to [sic] any type of diet is questionable and . . . she continues to eat foods that are high in sugar and high in fat." [Tr. 565]. Plaintiff was again provided dietary counseling and advised of specific ways in which exercise could help alleviate her various complaints. [Tr. 565]. At a followup appointment three months later, Ms. O'Connor opined that plaintiff was not adhering to "the diabetic diet that was written out for her at her last visit." [Tr. 561]. The importance of exercise, weight loss, and proper nutrition were again stressed, and "diet meal plan . . . was written out again today and given to her." [Tr. 561].

In July 2003, cardiologist Shobha Hiremagalur noted self-reports "suggestive of sleep apnea." [Tr. 465]. Plaintiff was evaluated by the Johnson City Medical Center Sleep Disorders Center. Administration of the Epworth Sleep Scale indicated only mild sleepiness. [Tr. 508]. Plaintiff was encouraged to lose weight. [Tr. 510]. An August 2003

8

sleep study indicated obstructive apnea/hypopnea syndrome. Recommendations included "[a]gressive weight loss with diet and exercise." [Tr. 506]. A similar study in November 2003 showed "moderate" symptoms and "excellent response" to CPAP. Physician recommendations included continued CPAP usage and "[a]gressive weight loss with diet and exercise." [Tr. 504-05].

Plaintiff underwent cardiac catheterization in June 2004 to check for possible arteriosclerotic heart disease. No more than "mild" irregularities were found. [Tr. 522].

A December 1998 RHSC notation reflects plaintiff's report of depression secondary to financial concerns. [Tr. 216]. An August 1999 notation reflects "lots of stress," again associated with finances. [Tr. 209]. At the request of plaintiff's counsel, clinical psychologist B. Wayne Lanthorn performed a consultative examination the day before the 2001 administrative hearing. Based on plaintiff's self-reports, her "wheezing," her "quite shaky" right hand, a "perusal" of medical records, and his administration of the Pain Patient Profile test ("P/3"), Dr. Lanthorn predicted that six vocational capacities would be "seriously limited, but not precluded." [Tr. 296-304]. He further opined that plaintiff has "[n]o useful ability to function" in six other work-related activities - relating to coworkers, dealing with the public, using judgment with the public, dealing with work stresses, relating predictably in social situations, and demonstrating reliability. [Tr. 303-04].

IV.

*Expert Testimony*

Drs. Thomas Schacht and Karen Tootle offered medical expert testimony at the 2001 hearing. Echoing the observation of examining physician Konrad, Dr. Tootle noted that plaintiff's purported constant wheezing and arm tremors "go away" when she is distracted. [Tr. 658-59, 678-79]. Dr. Tootle discussed the physical portion of plaintiff's existing medical record and concluded that no listing level impairments were present. [Tr. 659].

Dr. Schacht discussed the psychological portion of the record. Regarding Dr. Lanthorn's evaluation, Dr. Schacht noted that there was no information regarding duration or alleged date of onset. [Tr. 662-63]. Internal inconsistencies in the report were discussed. [Tr. 662]. Dr. Schacht furthered explained that the P/3 used by Dr. Lanthorn is not an objective test but rather merely a devise for compiling subjective complaints. [Tr. 664].

Plaintiff's counsel questioned the medical experts regarding the possible presence of a somatoform disorder.[5] Dr. Schacht testified that plaintiff's complaints were not consistent with "a classic somatization disorder." [Tr. 666-69, 673-74, 685-86]. Dr. Tootle agreed. Both experts testified that there was no objective evidence to prove the existence of a somatoform disorder - as opposed to other possibilities such as "a cry for help"

---

[5] Somatoform disorder is an impairment listed by the Commissioner. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07 ("Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."). A somatoform disorder is "characterized by symptoms *suggesting* a general medical condition but neither fully *explained by* a general medical condition, the direct effects of a psychoactive substance, or another mental disorder nor under voluntary control[.]" *Dorland's Illustrated Medical Dictionary* 532 (29th ed. 2000) (emphasis added).

or malingering for financial gain. [Tr. 666-86].

Vocational expert Cathy Sanders ("VE") testified at the 2005 administrative hearing. The ALJ presented a hypothetical claimant of plaintiff's age, work experience, and education. The hypothetical claimant would be restricted to light work with no exposure to excessive dust, chemicals, fumes, and temperature extremes. In response, the VE identified 11,400 regional positions - and 2,500,000 nationally - that the hypothetical claimant could perform. [Tr. 701-02]. If Dr. Lanthorn's assessment were credited, all work would be precluded. [Tr. 702]. If the claimant was limited to only occasional effective use of a hand, there would not be a significant number of jobs available. [Tr. 703]. Lastly, if plaintiff's self-reported limitations were deemed credible, all employment would be precluded. [Tr. 703-04].

V.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g)*; Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383,

11

387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

An individual is eligible for SSI on the basis of financial need and either age, blindness, or disability. *See* 42 U.S.C. § 1382(a). "Disability" is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof at the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *Id.*

VI.

*Analysis*

Plaintiff argues that the ALJ erred by not finding that she suffers from a severe mental impairment. She further contends that ALJ erred by not considering the vocational impact of her obesity and her sleep apnea. The court will address these issues in turn.[6]

A. <u>Severe Mental Impairment</u>

Referencing occasional self-reports of depression or stress, along with the restrictive assessment by Dr. Lanthorn, plaintiff argues that she could have been found to have some unspecified mental impairment of listing-level severity. The evidence cited by plaintiff is subjective in nature, but the ALJ found her complaints to generally be "not

---

[6] To the extent that plaintiff's criticisms rely on evidence previously submitted only to the Appeals Council, the court is not permitted to consider that evidence in determining whether to uphold, reverse, or modify the ALJ's decision. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Further, as made clear in footnote one of this opinion, plaintiff's additional evidence will not be considered in the context of sentence six remand because plaintiff has waived that issue. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

credible to any extent alleged." [Tr. 27]. Substantial evidence supports that conclusion.

As noted by the ALJ, plaintiff's wheezing and tremor behaviors have been described as disappearing when she is distracted, and her cooperation with Dr. Konrad's examination was "submaximal." [Tr. 25]. These facts alone destroy plaintiff's credibility. As further noted by the ALJ [Tr. 27], although plaintiff complained of foot pain with no relief from her diabetic shoes, the objective record showed her to be "doing well" with the shoes. [Tr. 519]. The ALJ also correctly pointed out that the severity of plaintiff's purported breathing problems are inconsistent with the testing and observations of her physicians. [Tr. 27]. Too, the extensive record is strikingly lacking in treatment for musculoskeletal pain complaints or right arm tremors, even though plaintiff claims to be constantly limited by those alleged problems.

Lastly, the ALJ correctly observed that plaintiff's "credibility is significantly diminished by her own non-compliance with diet and exercise in controlling her diabetes." [Tr. 27]. As cited in detail above, the record unquestionably contains substantial evidence to support the conclusion that plaintiff has refused to meaningfully participate in her own health care. Her style of life is utterly inconsistent with that of a person who suffers from the limitations alleged. *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).

The court stresses that this observation is not relevant merely to plaintiff's failure to *lose* weight. *See, e.g., Harris v. Heckler*, 756 F.2d 431, 435-36 n.2 (6th Cir. 1985)

("The [Commissioner] is certainly not entitled to presumptions that obesity is remediable or that an individual's failure to lose weight is 'wilful'. The notion that all fat people are self-indulgent souls who eat more than anyone ought appears to be no more than the baseless prejudice of the intolerant svelte.") (citation omitted). Instead, this evidence speaks to plaintiff's apparent failure to ever genuinely *attempt* to lose weight, exercise, or engage in a proper diet, even after multiple treating sources have directly related these solutions to her purported physical complaints.

> The Social Security Act did not repeal the principle of individual responsibility. Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant in this case chooses to drive [her]self to an early grave, that is [her] privilege – but if [she] is not truly disabled, [she] has no right to require those who pay social security taxes to help underwrite the cost of [her] ride.

*Sias.*, 861 F.2d at 480.

For all these reasons, substantial evidence supports the ALJ's refusal to transform plaintiff's subjective complaints into a credible "severe" mental impairment. Because plaintiff's subjective complaints cannot be relied upon, substantial evidence also supports the rejection of Dr. Lanthorn's objectively unsupported restrictions. The court again notes the testimony of medical advisor Schacht, who explained that the P/3 used by Dr. Lanthorn is not an objective test but rather merely a devise for compiling subjective complaints. [Tr. 664]. *Cf. Brown v. Barnhart*, No. 1:06cv00041, 2007 WL 120831, at *7 (W.D. Va. Jan. 11, 2007) (Substantial evidence supported the rejection of Dr. Lanthorn's P/3-based assessment because it was "not supported by . . . clinical findings[.]"); *Fields v.*

15

*Barnhart*, No. 2:05CV00015, 2005 WL 2385620, at *9 (W.D. Va. Sept. 22, 2005) (Substantial evidence supported the rejection of Dr. Lanthorn's testing and findings, which were "inconsistent with the evidence of record as a whole."); *Boyd v. Barnhart*, No. Civ.A.1:04 CV 00078, 2005 WL 555584, at *11 (W.D. Va. Mar. 9, 2005) (same). Further, to the extent that plaintiff seeks to rely on the low Global Assessment of Functioning ("GAF") score assigned by Dr. Lanthorn, the court notes that the score was based on plaintiff's unreliable self-reporting and is thus of minimal value. *See generally DeBoard v. Comm'r of Soc. Sec.*, No. 05-6854, 2006 WL 3690637, at *3-4 (6th Cir. Dec. 15, 2006).

Moreover, even assuming that the ALJ erred in finding no severe mental impairment, such error is harmless. The court notes that this is not a case in which a claimant has alleged only one impairment. In such cases, of course, an adverse determination at step two causes the entire application to be "screened out" as "totally groundless." *Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988). By contrast, in the present case plaintiff alleges - and the ALJ recognized - multiple severe impairments. Accordingly, despite the finding of no severe mental impairments, plaintiff's claim survived step two.

Plaintiff goes on to argue that the purported error should not be treated as harmless because the ALJ did not, at step three of his sequential evaluation, determine whether her "severe" mental impairment met or equaled a listed impairment. Plaintiff does not explain to the court, however, which listed impairment she purportedly satisfies. The argument is thus waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)

16

("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted).

Lastly, presuming that plaintiff is referring to the Commissioner's 12.07 somatoform disorder listing, the 2001 medical advisor testimony provides substantial evidence for the conclusion that plaintiff does not meet or equal that condition - as adequately discussed by the ALJ. [Tr. 22]. The court recognizes that plaintiff's wildly incredible claims may indeed be the product of mental illness. However, the court is also aware that other explanations exist - up to and including malingering for financial gain. [Tr. 666-84]. As aptly explained by Dr. Schacht, plaintiff's argument is essentially that "every person who made a complaint that lacked objective basis would by default have a somatoform disorder and that's just not the case." [Tr. 673-74]. The ALJ's well-explained decision to reject plaintiff's unsupported "speculation" will not be disturbed on substantial evidence review.

### B. Obesity and Sleep Apnea

Plaintiff also contends that ALJ erred by not considering the vocational impact of her obesity and her sleep apnea. The court disagrees. The ALJ cited Dr. Konrad's evaluation [Tr. 25], wherein obesity was considered. Dr. Konrad cited objective musculoskeletal evidence in concluding that plaintiff has no physical limitations. [Tr. 271-

17

72]. The ALJ also considered plaintiff's sleep apnea, pointing out that there are no vocational limitations of record from any source regarding that condition. Instead, plaintiff has been instructed to exercise and lose weight. [Tr. 26]. The record also documents only "moderate" symptoms, "excellent response" to CPAP, and only mild sleepiness.

Again, substantial evidence supports the ALJ's conclusion that plaintiff's self-reported limitations "are not credible to any extent alleged." [Tr. 27]. For the reasons discussed above, plaintiff's subjective complaints will not carry the day absent objective support. *See Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847 (6th Cir. 1986). In the present case, such support is lacking.

In sum, the court finds substantial evidence to support both the ALJ's RFC findings and his ultimate conclusion, for which sufficient rationale was provided consistent with the mandate of the Commissioner's Appeals Council. *Perhaps* a different factfinder could have reached a different conclusion in this case, but that is not the standard of review binding this court. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993). The final decision of the Commissioner will be affirmed, and an order consistent with this opinion will be entered.

ENTER:

                                              s/ Leon Jordan
                                     United States District Judge